## ESTATE OF MICHAEL LEAHY, DECEASED.

[No. 12,338; decided May 31, 1893.]

Homestead—Whether Absolute or for Limited Period.—When no homestead has been selected during the lifetime of decedent, a homestead for the use of the widow and minor children can be set apart absolutely only out of the common property; if there is no common property, then a homestead may be set apart out of the separate estate of the decedent, but only for a limited period, to be designated in the order, and the title vests in the heirs of the deceased, subject to such order.

Homestead.—While the Homestead Law Should be Liberally Construed, and the widow and minor child should not be deprived of any of the rights which the law gives them, yet nothing not equitable and just should be done as between the widow and minor child on the one hand and the adult children on the other.

Community Property.—The Changing of the Form does not Destroy the Identity of separate property.

Community Property.—Where Part of the Purchase Price of Real Property was obtained by the decedent by the pledge of his separate property, and there is not money enough on hand in the estate to redeem the pledge, the remote contingency that the estate of decedent might, at some time, be able to redeem it, cannot change the character of the transaction so as to make the real estate common property for the purpose of a homestead application.

Community Property.—Where Property is Acquired by Funds Belonging Partly to the separate property of one spouse and partly to the common property, the property so acquired becomes in part the separate property of the spouse who furnishes the funds from his or her separate property, and in part the common property of both spouses, in proportion to the separate and community funds invested in it.

Homestead—Property from Should be Selected.—In determining an application for a homestead, all the circumstances must be considered, and where the real property sought to be set apart was purchased mainly with separate funds of the decedent, and was all the real property of and constituted the major portion of the estate, and there are adult heirs, such real property should not be set apart to the widow and minor child absolutely.

Michael Leahy died intestate on July 12, 1892, leaving him surviving Ellen, his widow, and Alice, their minor child, and also a number of adult children by a former wife.

The widow was appointed administratrix of the estate on August 1, 1892, and on August 26, 1892, filed her petition to

have set apart to her as a homestead, absolutely, a lot on Bartlett street, in San Francisco, which she claimed was community property.

Sawyer & Burnett, for the petitioner.

Wheaton, Kalloch & Kierce, for the adult heirs.

COFFEY, J. The application to set apart a homestead in this proceeding is based on section 1465 of the Code of Civil Procedure of this state, which provides, among other things, as follows: "If none [referring to a homestead] has been selected, designated and recorded . . . . the court must select, designate and set apart, and cause to be recorded, a homestead for the use of the surviving husband or wife and the minor children, out of the common property," etc.

The petition filed herein alleges that the real estate described therein is the community property of the widow and her deceased husband; that it was purchased on the seventeenth day of May, 1888; that no homestead was recorded during the lifetime of the deceased, and that there is one minor child.

The answer filed to the petition of the applicant admits all the facts except that the property is the community property of the applicant and her deceased husband, but alleges that it was purchased in part with the earnings and dividends of the separate estate of the deceased, and that thirty shares of stock, separate property, were hypothecated as part of the purchase price.

It is admitted that the piece of property is appraised at $6,100; that thirty shares of stock have been pledged to pay $1,500 of the purchase price of the said piece of real estate; that the widow is to receive $2,000 from the United Order of Workmen, as her separate property, and that at the time applicant married deceased he owned as his separate property either thirty-one or two shares of stock in the Workingmen's Boot and Shoe Company of the par value of $50 per share.

The contention in the matter narrows itself down to the fact as to whether the real estate was purchased in part with

separate funds or whether it was entirely purchased with community funds.

For the purpose of proving opponent's side of the case, Walter Rosie, secretary of the Boot and Shoe Company, was subpoenaed, and after he was sworn and in part examined, it was suggested that he furnish an itemized ledger account showing the amount of dividends, and the amounts and times when stock was purchased, from the time of the marriage up to date. This account shows the following facts: At the time the deceased married he owned thirty-one shares of stock of the value of $1,550. On July 2, 1877, the dividends on that stock amounted to $186; to that amount the deceased added $14 in cash and purchased four shares of stock. On January 5, 1878, the dividends amounted to $210, and on that day he purchased four shares of stock for $200 and left the remaining $10 with the company. On July 1, 1878, the dividends amounted to $234, and adding $6 he purchased five shares of stock. On January 2, 1879, the dividends amounted to $198, and adding $2 in cash he purchased four more shares of stock. On July 2, 1879, the dividends amounted to $216, and on the following day he purchased four more shares of stock and drew out $16 in cash. On January 5, 1880, the dividends amounted to $234, to which he added $16 in cash and bought five shares of stock. On July 1, 1880, the dividends amounted to $85.50, to which he added $14.50 in cash and bought two shares of stock. On January 1, 1881, the dividends amounted to $88.50, and to that amount he added $11.50 in cash and purchased two shares of stock. On July 5, 1881, the dividends amounted to $183. To that $17 in cash were added and four shares of stock were purchased. On January 5, 1882, the dividends amounted to $195, to which $5 in cash were added and four shares of stock purchased. On July 10, 1882, the dividends amounted to $138, to which $12 in cash were added and three shares of stock purchased. On January 3, 1883, the dividends amounted to $288, to which $12 in cash were added and six shares of stock were purchased. On July 2, 1883, $400 in cash were put in, and on July 9th a dividend of $195 declared, and on that day ten shares of stock were purchased, and on the 16th of July $95 in cash were drawn out. On January 6, 1884, the dividends

amounted to $308, and six shares of stock were purchased, and $8 in cash drawn out. On July 7, 1884, the dividends amounted to $423, and on that day the last shares of stock, six in number, were purchased and $123 were drawn out. This fully accounts for the one hundred shares of stock owned by the estate.

To buy the sixty-nine shares of stock after the deceased married in 1877, the purchase price of which was $3,450, the deceased added to the dividends accruing from the stock the sum of $510 up to the time the last stock was purchased, and during the same period drew out from the dividends the sum of $242. If we assume that the $510 paid in be community property, it still leaves eighty-nine and four-fifths shares of stock as separate property, and it is admitted that thirty shares of stock were pledged to make part of the purchase price.

The secretary of the Hibernia Bank produced the accounts of the deceased with that bank, and copies of the accounts have been introduced in evidence pursuant to order. The first bank account covers a period of time from January 11, 1881, to May 9, 1888.

The second account covers a period of time from March 22, 1888, up to date.

From and after the last purchase of stock up to the time of the purchase of the real estate in May, 1888, the following facts appear from the first bank account and from the account with the Boot and Shoe Company: On July 12, 1894, the deceased received in cash as dividends the sum of $123, and on July 21st $100 were deposited in the bank. On January 3, 1885, $450 were received as dividends and $500 were placed in bank. On July 11, 1885, $300 were received as dividends, and on July 25, $300 were put in bank. On January 16, 1886, $225 were received as dividends, and on February 4th, $200 were put in bank. On March 1, 1886, $225 were received as dividends, and on March 8th, $250 were put in bank. On July 16, 1886, $150 were received as dividends, and on August 16th, $100 were put in bank. On August 28th, $150 were received as dividends, and on September 16th, $200 were put in bank. On March 18, 1887, $300 were received as dividends, and on March 28th, $350 were placed in

bank. On July 16, 1887, $200 were received as dividends, and on the 18th of July, $200 were placed in bank. On February 18, 1888, $225 were received as dividends, and on February 17, 1888, $130 were placed in bank.

The dividends during this time amounted to $2,573, and during this time $2,330 went into the Hibernia Bank. Now, as fully ninety per cent of the stock is separate estate, ninety per cent of its dividends must also be separate property, and a large percentage of this went into the Hibernia Bank and was drawn out to make part payment on the purchase price of the real estate on May 9, 1888. All the facts shown by the bank accounts and Boot and Shoe Company's account show that a large part of the separate estate went toward buying the real property.

Passing from the state of facts established, let us consider the contention of applicant.

Counsel for applicant suggest that this is not a controversy between creditors and a widow and minor, but that it is a contention between adult heirs and the widow and minor child.

Counsel also suggest that homesteads are provided for in every state in the Union, and are liberally construed in favor of the claimant.

This is true, and the widow and minor child should not be deprived of any of the rights which the law gives them, and the widow should have a homestead set apart, not, however, absolutely, as counsel desires, but either for life or for a limited period. Nor should anything be done but what is equitable and just, as between the widow and those who are, equally with her, entitled to the benefits of their father's patrimony.

Counsel for applicant contend that the court must set apart a homestead, and cites section 1465, Code of Civil Procedure, to sustain that contention.

The only condition under which a homestead can be set apart under that section is when it is community property, as by the use of the words "community property" it expressly excludes all other property, and where property partakes of the nature of both community and separate property, as in

this case it does, it is beyond the power of the court to set aside the homestead absolutely.

It is not necessary to contend against the doctrine laid down by the many cases of the supreme court of this state upon cases where homesteads have been applied for upon community property and been set apart absolutely.

In the Estate of Ballentine, 45 Cal. 696, cited by counsel for applicant, the property was community property, and so with the series of cases that have followed it.

It was once supposed in this state that the widow was entitled to have set apart to her absolutely a homestead out of the separate property, and such seems to have been the doctrine laid down by the supreme court in Mawson v. Mawson, 50 Cal. 541, but whatever effect that case may have had as an authority upon that subject, it has been overruled in the Estate of Schmidt, 94 Cal. 334, 29 Pac. 714.

This probate department has several times held that where the estate is separate property, a homestead should be given for a limited time or for life: Estate of R. T. Maxwell, 1 Cof. Pro. Dec. 126; Estate of Robert N. Tate, 1 Cof. Pro. Dec. 217; Estate of Lahiff, decided by this court and affirmed in 86 Cal. 151, 24 Pac. 850.

Whenever the property is not community property, the power of the court to set it aside as a homestead is governed by the provisions of section 1468 of the Code of Civil Procedure, which provides that ''the court can only set it apart for a limited period to be designated in the order, and the title vests in the heirs of the deceased subject to such order.''

The second point made by counsel for applicant is, that although the property is appraised at more than $5,000, that that is no objection to setting it apart absolutely as a homestead.

The Estate of Walkerly, 81 Cal., page 580, 22 Pac. 881, is cited to sustain that contention.

That case must be viewed in the light of the circumstances under which it was decided. In that case the estate was of the value of $500,000 over and above all indebtedness. The homestead was of the value of $15,000. The court below set apart the homestead for the widow and child for a limited

period, and the court says, page 584: ''The estate here is a large one, and we cannot say, from the evidence before us, that the court below abused its discretion in the matter.'' The circumstances in the case at bar are very different. In this case the widow asks to have all the real estate set apart to her and the minor child absolutely and completely and forever taken from the assets of the estate.

The third point for which counsel for applicant contend is the presumption that the real estate, purchased eleven years after the marriage, is common property.

The case of Meyer v. Kinzer, 12 Cal. 247, 73 Am. Dec. 538, is cited as sustaining the doctrine that this presumption can only be overcome by clear and convincing proof that the property is separate property. The counsel say we know of no ''clear and convincing proof'' that it is not common property. Counsel further say that it is in evidence that at the marriage Mr. Leahy owned thirty-one shares of stock in the Workingmen's Boot and Shoe Factory, but that the stock still belonged to him at his death, and now forms part of his estate, etc.

It is shown satisfactorily to the court, by the account taken from the books of that corporation, that the dividends of the stock have produced nearly all the other shares of stock now owned by the estate. It is also admitted that $1,500 of the very purchase price of the real estate came from the hypothecation of thirty shares of this stock, and no matter whether that stock be the original shares of stock, or that purchased afterward with the dividends and a small portion of advanced cash, it is still clearly and unmistakably mainly the separate, if not entirely the separate, property of the deceased. In addition have been traced the dividends which are largely separate property from the factory to the bank, and from there into the very purchase price of the real estate. There is no escape from one proposition, and that is that there is not money enough on hand in the estate to redeem these shares of stock. It matters not from what point it may be viewed, the fact is undeniably true that thirty shares of stock have been pledged, that these shares of stock are mainly, if not entirely, separate property, and that the money for

which they were hypothecated was paid as part of the purchase price of the realty.

The changing of form does not destroy the identity of separate property, and it is immaterial whether the indebtedness has been paid or not: Civ. Code, sec. 163.

Suppose that the deceased had owned anything else, and had pledged it, or exchanged it to pay part of the purchase price of this real estate, would not the money arising from that pledge be separate property? If A owes B $1,000 on a note before B's marriage, and B hypothecates the note to obtain $1,000 to pay upon a piece of real estate, would not that money be separate property?

The remote contingency that the estate of Michael Leahy might at some time be able to redeem the pledged stock from the hands of the pledgee cannot so change the matter as to make this piece of real estate, purchased by the hypothecation of this separate property, common property for the purpose of this application.

It has been shown that this property was purchased in part by separate funds, arising from the hypothecation of stock and cash dividends arising from the stock, nine-tenths of which is separate property: In re Bauer, 79 Cal. 304, 21 Pac. 759.

In that case, like the one at bar, the question was whether the realty was partly the separate estate of the deceased and partly community property, or whether it was entirely community property. It was claimed in that case, as it is in this, that the property was community property, as it was purchased during coverture. The effect of the presumption is fully discussed on pages 307 and 308 of the opinion. In the Bauer case, at the time of his marriage the deceased had personalty valued at $3,000; in the case at bar the value is $1,550. In that case it appears that he commingled his separate and community earnings; in this case every cent of dividends is accounted for up to the present time. The dates when stock was purchased, the dates when dividends were paid, and the amounts paid toward buying stock, fully appear and are easily figured out. From the time the last stock was purchased up to the time that the realty was purchased, the amount of dividends fully appears, the days

when drawn, and in fact the bank accounts almost conclusively show that nearly all the money went from the factory to the bank, and the proportions are easily seen.

In the case at bar the widow has it in her power to show where every cent of money was obtained, and, having failed to oppose the showing made by the opponents of the application, from the bankbooks, it may fairly be inferred that she was unable to show that the dividends were not conveyed to the bank at the times shown: See facts of the Bauer Case, 79 Cal. 309, 21 Pac. 759.

The doctrine applied in that case may be invoked in this, that "where property is acquired by funds belonging partly to the separate property of one spouse, and partly to the community property, the property so acquired becomes in part the separate property of the spouse who furnishes the funds from his or her separate property, and in part the community property of both spouses, in proportion to the separate and community funds invested in it: Schuyler v. Broughton, 70 Cal. 282, 1 Pac. 719. In following the separate property of deceased through its various mutations in the two banks and in his business until the purchase of the homestead, we are aided by the principles that, it having been conclusively shown that deceased owned separate property at the time of his marriage, it continued to remain such (Code of Civil Procedure, section 1963, subdivision 32), and that the profits thereof acquired the same character (Civil Code, section 163)'': 79 Cal. 309, 310..

It has been satisfactorily shown in this case that the accumulations of the separate property of the deceased have in part paid for the realty, and the decision of this department in the Estate of Tate, supra, should control in this case.

In that case this court said: "The power of the court is limited by a sound discretion acting upon the circumstances of the particular case. The fee passes to the heirs, in this case the petitioner and the applicant, in equal shares, with a limited estate as a homestead in the surviving widow. . . . . If the petitioner were young, and likely to remarry, and obtain a home and support by that act, a limitation for life might be indiscreet, but, considering her age—she is now

sixty-two . . . . the court is of opinion that she is entitled to have a homestead set apart for life, and it is so ordered."

Counsel for applicant in their brief, in this case, say that "the policy of the law is to protect the widow and minor children. In most cases the widow has contributed by her exertions to the accumulation of the property, and she should not be turned out upon the world after years of hard labor, and frequently when her best days have passed. The minor children, of course, should be protected, because they are not able to make their livelihood."

It is evident from the foregoing statement that counsel assume that the adult heirs are trying to thrust out the widow and minor child upon the charity of the cold world, homeless and houseless, but the court does not so understand their position in the matter. The adult heirs are not contending that no homestead at all should be allowed, but that no absolute homestead should be set apart, and thus absolutely withdraw from administration the major portion of the estate, and leave comparatively nothing in the estate for them at its close.

Either a limited homestead, or a homestead for life, is all that ought to be allowed in this case. The widow is to receive, if she has not already done so, the sum of $2,000 from a benevolent order, and this for her own and separate use. The adult heirs, born of another mother, their father having a good paying separate estate at the time he married the applicant, should not be shut out of view in considering this application.

The widow is now nearly sixty years of age and the minor child is over the age of thirteen years.

The real estate is shown to have been purchased in part with the proceeds of separate estate, and a homestead should not be granted absolutely, but only for a limited period, or for life.

The court awards it for the life of the applicant.

---

What Property Belongs to the Community is the subject of a note to Estate of Foster, 4 Cof. Pro. Dec.

When a Probate Homestead is selected for the separate estate of the decedent, the court can set it apart for a limited period only. The remainder in fee vests in the heirs, even to the exclusion of devisees named in the will: 1 Ross on Probate Law and Practice, 495.